Catherine A. **LITTLETON**,
**Appellant–Defendant,**

v.

**STATE of Indiana, Appellee–Plaintiff.**

**No. 49A04–1101–CR–25.**

Court of Appeals of Indiana.

Oct. 6, 2011.

John F. Kautzman, Andrew R. Duncan, Ruckelshaus, Kautzman, Blackwell Bemis & Hasbrook, Indianapolis, IN, Attorneys for Appellant.

Gregory F. Zoeller, Attorney General of Indiana, Ian McLean, Deputy Attorney General, Indianapolis, IN, Attorneys for Appellee.

## OPINION

BAILEY, Judge.

### Case Summary

Catherine A. Littleton ("Littleton") was charged with one count each of Criminal Confinement, as a Class C felony, Neglect of a Dependent, as a Class D felony, and Battery, as a Class B misdemeanor. In this discretionary interlocutory appeal, Littleton challenges the trial court's denial of her motion to dismiss the charging information on two grounds. Littleton contends that the trial court abused its discretion when it declined to dismiss the charges against her because her acts were privileged by her qualified immunity as a teacher *in loco parentis*. She also argues that, in light of the trial court's holding that her Fifth Amendment right against self-incrimination was violated under *Garrity v. New Jersey*, 385 U.S. 493, 87 S.Ct. 616, 17 L.Ed.2d 562 (1967), dismissal of the

charges was required under the rule announced in *Kastigar v. United States*, 406 U.S. 441, 92 S.Ct. 1653, 32 L.Ed.2d 212 (1972).

The State contends that we do not have jurisdiction to consider Littleton's qualified immunity argument, that in any event the trial court properly declined to dismiss the charges against her, but that the trial court nonetheless abused its discretion when it concluded that Littleton's Fifth Amendment rights were violated.

Finding that we have jurisdiction to consider the question of qualified immunity, and finding that issue dispositive, we reverse the decision of the trial court and remand for dismissal of the charges.

### Facts and Procedural History

On February 18, 2010, the time of the events at issue, Littleton was working as a sixth-grade special education teacher at Perry Meridian Middle School ("Perry Meridian"). Littleton was assisted by and supervised several classroom aides, including Jeffery Stokes ("Stokes"). Among the students in Littleton's class and present in her room that day was C.J., a twelve year-old who had been diagnosed with autism [1] and other developmental disorders. C.J. was partially fed through a "G-tube" in his abdomen and had limited verbal abilities, so that he communicated largely through sign language, pointing, and grunting.

C.J. was known to display behaviors that posed the potential for harm to himself or others, including kicking or hitting himself, other students and staff, and classroom furnishings. Though Littleton and other school staff had developed an Individual Education Program ("IEP") for C.J., there was no formal Functional Behavior Assessment ("behavior plan") in place to deal with C.J.'s outbursts. In the absence of a behavior plan, Littleton and her classroom aides had developed a protocol for addressing these outbursts. This protocol called for a series of escalating measures beginning with attempting to redirect C.J.'s attention to other activities, playing music, dancing, hugging, and taking C.J. into a hallway outside the classroom to calm down.

At some point in 2009 or 2010, Littleton and her aides added to this protocol the use of a "Rifton chair." (Tr. 17.) A Rifton chair is designed for children with orthopedic disorders, was present in Littleton's classroom, and may have been assigned to C.J. at some prior point in his education. The Rifton chair is made of wood, has arms and a curved back and seat, and may be used with an orthopedic belt around a child's waist to prevent the child from falling from the chair. The chair may also be used to contain a student in a particular location.

Littleton and her aides developed an approach using the Rifton chair to address C.J.'s outbursts when no other calming measure proved effective. On occasions where C.J. was particularly difficult to calm down, Littleton or one of her aides would seat C.J. in the Rifton chair, use an orthopedic belt around his legs and waist to keep him in the chair, and sit in front of him to restrain his legs. This occurred two or three times at various points between late 2009 and February 2010, and Littleton, Stokes, and Nola Albers ("Albers"), another of Littleton's aides, had

---

1. Autism is a disorder that affects the development of social and communication skills. Symptoms may range from moderate to severe in nature, and can include problems with social interaction, communication skills, and unusual or inappropriate responses to sensory information. Aggression, impulsiveness, irritability, mood swings, and behavioral outbursts associated with autism-spectrum disorders are often treated with medication and various forms of therapy. *See Autism—PubMed Health*, http://www.ncbi.nlm.nih.gov/pubmedhealth/PMH0002494/, last reviewed April 26, 2010, last visited Sept. 12, 2011.

been involved in these measures to varying degrees. None of these individuals, or any other witnesses who provided testimony to the trial court, had training in proper use of the Rifton chair for restraint or in restraining techniques generally, and there were no provisions in C.J.'s IEP or in Perry Meridian rules generally proscribing or otherwise regulating such measures.

On February 18, 2010, C.J. began to display self-harming behaviors, striking himself with his hands. Littleton and Stokes attempted to use the various planned measures to calm C.J., progressing through the established protocol, but none worked. Littleton was involved in conference calls and was preparing IEPs for various students, and Stokes showed Littleton orthopedic belts. Littleton, nodding her head at Stokes, indicated agreement that use of the Rifton chair would be appropriate.

Stokes then seated C.J. in the Rifton chair. When this failed to calm C.J., Stokes placed socks on C.J.'s hands to prevent him from harming himself and taped his hands together. C.J. still did not calm down. Using the orthopedic belts, Stokes strapped C.J.'s left and right legs to the corresponding legs of the Rifton chair, and eventually restrained C.J. into the Rifton chair with another belt around his waist. Stokes then tipped the chair back so that its back lay flat on the floor while C.J.'s feet were in the air. Stokes testified that C.J. laughed during this process.

Albers had been out of the room for some portion of this incident taking Littleton's students to post-lunch activities. Upon returning to the classroom, Albers saw C.J. and asked Littleton why C.J. was tipped back in the Rifton chair in a corner of the room. Littleton then approached C.J., who smiled up at her. Littleton then instructed Albers to release C.J. from the chair. Upon release, C.J. was "perfectly content," and the rest of the school day proceeded without further incident. (Tr. 136.) The evidence presented to the trial court indicates that the entire incident occurred over the course of a few minutes, though the exact length of time is unclear. The evidence also varies on whether and to what extent Littleton was aware or approved of Stokes's measures, for what period of time Littleton was present in the room and should have known of C.J.'s situation while he was restrained, the extent of Albers's knowledge of the practice of restraining C.J., and whether and when Albers was in the room for this incident.[2]

On February 19, 2010, Albers informed David Rohl ("Rohl"), Perry Meridian's principal, that she was concerned with the events surrounding C.J.'s alleged restraint the prior day. After speaking with Albers, Rohl called Littleton to his office and asked her about the prior day's events; Rohl did not inform Littleton of her constitutional rights before asking her questions. Littleton related her version of events to Rohl. Rohl relayed a report to his superiors at the Perry Township School Corporation and to Marion County Child Protective Services ("CPS"). Littleton was subsequently placed on administrative leave without pay.

---

2. For example, Albers testified that she came into the room after changing another child's clothes, saw C.J. tipped back, left the room, spoke to another aide, returned to the room, and confronted Littleton about the situation. Stokes testified that Albers was present in the classroom along with himself and Littleton, and was already present when Stokes left the room. Stokes also testified that Albers was aware of and had participated in restraining C.J. on at least one prior occasion; Albers testified only that she was aware of prior occasions where some degree of restraint had been used when C.J. kicked classroom furnishings or other students.

On April 26, 2010, the State filed charges against Littleton and Stokes. On June 23, 2010, Littleton filed her Motions to Dismiss and to Suppress Evidence, seeking dismissal of the charges against her or, in the alternative, suppression of evidence obtained as a result of her statements to Rohl. The Motion to Dismiss argued that Littleton was entitled to qualified immunity for her actions on February 18, 2010, and both motions argued that Rohl's February 19, 2010, discussion with Littleton constituted a violation of her privilege against self-incrimination under the U.S. Supreme Court's decision in *Garrity v. New Jersey*, 385 U.S. 493, 87 S.Ct. 616, 17 L.Ed.2d 562 (1967).[3] A hearing was conducted on these motions on July 21, 2010, during which both Littleton and the State presented testimony and other evidence ("the *Garrity* hearing"). On August 25, 2010, the trial court entered its findings and conclusion ("the *Garrity* order"). In the *Garrity* order, the court concluded that Littleton's Fifth Amendment rights against coerced self-incrimination had been violated and granted Littleton's motion to suppress evidence obtained from use of her statements to Rohl. The trial court declined to dismiss the charges against Littleton on the basis of her claim of qualified immunity and her claim that *Garrity* afforded sufficiently broad immunity as to prevent further prosecution.

During the *Garrity* hearing, Littleton requested that the trial court schedule a second hearing on the extent to which *Garrity* afforded her immunity from further prosecution, pointing to the need to determine the extent to which the State had independent evidence upon which to pursue charges against her under *Kastigar v. United States,* 406 U.S. 441, 92 S.Ct. 1653, 32 L.Ed.2d 212 (1972).[4] That hearing was conducted on October 22, 2010 ("the *Kastigar* hearing"). During the *Kastigar* hearing, the State examined, and Littleton cross-examined, Detective Julie Dutrieux ("Detective Dutrieux") of the Indianapolis Metropolitan Police Department, who was assigned to investigate the case. Also during this hearing, the State requested that the trial court incorporate into its deliberations the evidence presented at the *Garrity* hearing. The trial court granted this request.

On November 30, 2010, the trial court entered its findings and conclusion ("the *Kastigar* order"), which reaffirmed its prior finding that Littleton's rights against coerced self-incrimination had been violated but denied her request that the charges against her be dismissed under her proffered rationale. Pursuant to the State's request, the trial court included in its deliberations the evidence presented at the *Garrity* hearing. It also incorporated by reference the findings and conclusions of the *Garrity* order, reaffirmed the court's conclusions on whether Littleton's statements to Rohl amounted to constitutionally improper self-incrimination, and concluded that the State had sufficient evidence independent of Littleton's statements to Rohl to proceed with its case.

---

**3.** In *Garrity,* the Supreme Court held that where a public employee is subject to a policy requiring him to choose between waiving his Fifth Amendment right against self-incrimination or facing dismissal from employment, if the employee makes incriminating statements, those statements are obtained in contravention of his constitutional right not to incriminate himself.

**4.** In *Kastigar,* the Supreme Court held that, unless a grant of immunity is expressly broader, such immunity is coextensive with the Fifth Amendment's privilege against self-incrimination. Taken with *Garrity, Kastigar* entitles individuals with use and derivative use immunity as to any testimony or evidence given that falls within the confines of the Fifth Amendment protections afforded to public employees.

On December 30, 2010, Littleton requested that the trial court certify the *Kastigar* order for interlocutory appeal. The trial court did so the same day.

On January 28, 2011, Littleton filed her Petition to Entertain Jurisdiction of Interlocutory Appeal, in which she sought this court's acceptance of discretionary interlocutory jurisdiction over the *Kastigar* order under Appellate Rule 14(B). On March 4, 2011, this court accepted jurisdiction over Littleton's interlocutory appeal. On March 10, 2011, Littleton filed her notice of appeal.

Additional facts and evidence will be provided as required.

## Discussion and Decision

### *Standard of Review*

■■■ Littleton appeals from the trial court's denial of her motion to dismiss the charging information in the *Kastigar* order. Littleton contends that under the facts as alleged and the evidence presented during the *Garrity* hearing, the evidence and the findings and conclusions of which were incorporated into the *Kastigar* order, her conduct was privileged and she therefore enjoys qualified immunity from prosecution for the events of February 18, 2010, as a teacher *in loco parentis* pursuant to Indiana Code section 20–33–8–8. Our standard review in such cases is well settled:

> On appeal, the reviewing court will review a trial court's grant of a motion to dismiss an information for an abuse of discretion. *Johnson v. State*, 774 N.E.2d 1012, 1014 (Ind.Ct.App.2002). In reviewing a trial court's decision for an abuse of discretion, we reverse only where the decision is clearly against the logic and effect of the facts and circumstances. *Id.*

*State v. Isaacs*, 794 N.E.2d 1120, 1122 (Ind.Ct.App.2003).

### *Interlocutory Jurisdiction*

■■■ Before we reach the substantive issue presently before us, we address the State's contention in its responsive brief that we lack jurisdiction to consider this issue. The State notes that we accepted jurisdiction over this discretionary interlocutory appeal from the *Kastigar* order, but that the trial court's decision on the question of qualified immunity came several months before in the *Garrity* order.

■■■ Appellate Rule 14(B) provides for our discretionary interlocutory review of orders certified to us by the trial court. Upon acceptance of interlocutory jurisdiction of an appeal, our review extends to the entirety of the order and not merely specific issues therein, and we are under " 'no obligation to accept the issue as framed by the trial court or to answer it.' " *State v. Keller*, 845 N.E.2d 154, 160 (Ind. Ct.App.2006) (quoting *Budden v. Bd. of Sch. Comm'rs of Indianapolis*, 698 N.E.2d 1157, 1166 n. 14 (Ind.1998)). Whenever possible, we prefer to resolve matters on their merits rather than "to erect procedural obstacles to their presentation." *Lindsey v. De Groot Dairy LLC*, 867 N.E.2d 602, 605 (Ind.Ct.App.2007) (concluding that a trial court erred in dismissing a petition for judicial review), *trans. denied.* Moreover, a trial court may "revisit prior decisions of its own." *Stewart v. Kingsley Terrace Church of Christ Inc.*, 767 N.E.2d 542, 546 (Ind.Ct.App.2002). While trial courts should be reluctant to do so, *id.*, we note that here the trial court incorporated its prior findings and conclusions from the *Garrity* order without also modifying its decision at that time.

Here, the State contends that the trial court erroneously found that the State requested that both the record of the *Garrity* hearing and the *Garrity* order itself be incorporated into the *Kastigar* hearing. Because of this error, the argument goes,

our interlocutory jurisdiction over the *Kastigar* order does not properly encompass the entirety of the *Garrity* order. Rather, the State argues, our jurisdiction extends only to those matters from the *Garrity* order that the *Kastigar* order revisited—namely, the trial court's reaffirmation of the conclusion that Littleton's right against coerced self-incrimination as set forth in *Garrity*.

 We acknowledge the State's distinctions on this point but nevertheless conclude that we may properly exercise jurisdiction over the qualified immunity issue Littleton raises. Because a trial court may reevaluate its own orders during the course of a proceeding until that order becomes final and appealable, it was within the trial court's discretion in this case to incorporate the *Garrity* order into the *Kastigar* order. The trial court did so, and it is therefore within the scope of our jurisdiction over this interlocutory appeal to review the *Garrity* order as well as the *Kastigar* order.

### *Qualified Immunity*

 We turn now to the dispositive question here, whether the events of February 18, 2010, come within the qualified immunity extended to Littleton as a teacher *in loco parentis*. Indiana Code section 35–34–1–4 permits a trial court to dismiss a criminal information upon a defendant's motion because, among other reasons, the facts alleged do not constitute a criminal offense or the defendant is immune from prosecution for the charged offense. I.C. § 35–34–1–4(a)(5) & (6). The trial court may hear and consider evidence beyond the charging information to determine whether the defendant may properly be charged with having committed a criminal act. *State v. Fettig*, 884 N.E.2d 341, 344 (Ind.Ct.App.2008) (citing *Zitlaw v. State*, 880 N.E.2d 724, 728–29 (Ind.Ct.App.2008), *trans. denied* ).

Here, Littleton was charged with Criminal Confinement, Neglect of a Dependent, and Battery. She claims that her acts were privileged because they come within the qualified immunity afforded to teachers under Indiana law. The Indiana Code states:

(a) Student supervision and the desirable behavior of students in carrying out school purposes is the responsibility of:

(1) a school corporation; and

(2) the students of a school corporation.

(b) In all matters relating to the discipline and conduct of students, school corporation personnel:

(1) stand in the relation of parents to the students of the school corporation;

(2) have the right to take any disciplinary action necessary to promote student conduct that conforms with an orderly and effective educational system, subject to this chapter; and

(3) have qualified immunity with respect to a disciplinary action taken to promote student conduct under subdivision (2) if the action is taken in good faith and is reasonable.

I.C. § 20–33–8–8. Our statutes further provide that a teacher or other school staff member "may take any action that is reasonably necessary to carry out or to prevent an interference with an educational function that the individual supervises." I.C. § 20–33–8–9(a) & (b).

As to section 20–33–8–8's provision that teachers stand *in loco parentis* in matters of school discipline, our supreme court has observed that Indiana courts "have construed Indiana Code section 35–41–3–1—the defense of legal authority—as including reasonable parental discipline that would otherwise constitute battery." *Willis v. State*, 888 N.E.2d 177, 180–81 (Ind. 2008). In *Willis* our supreme court re-

versed the conviction for battery of a parent who used an extension cord or belt to swat her son's buttocks five to seven times. Some of the strikes landed on the child's arm and thigh and left bruising. After seeing the bruises, a school official reported the injuries to CPS, which in turn contacted police. Willis was convicted at trial, and we affirmed. *Id.* at 179–180.

Our supreme court reversed the conviction, noting Willis's progressive discipline problems with her child and the failure of less stringent measures to address these issues. The court adopted the test from the *Restatement (Second) of Torts* for the reasonableness of a parent's use of force or confinement to discipline a child.

"A parent is privileged to apply such reasonable force or to impose such reasonable confinement upon his [or her] child as he [or she] reasonably believes to be necessary for its proper control, training, or education." Restatement of the Law (Second) Torts, § 147(1) (1965). We adopt the Restatement view. Not only is it entirely consistent with the law in this jurisdiction, but also it provides guidance on the factors that may be considered in determining the reasonableness of punishment. It reads:

In determining whether force or confinement is reasonable for the control, training, or education of a child, the following factors are to be considered:

(a) whether the actor is a parent;

(b) the age, sex, and physical and mental condition of the child;

(c) the nature of his offense and his apparent motive;

(d) the influence of his example upon other children of the same family or group;

(e) whether the force or confinement is reasonably necessary and appropriate to compel obedience to a proper command;

(f) whether it is disproportionate to the offense, unnecessarily degrading, or likely to cause serious or permanent harm.

Restatement, *supra*, § 150.

*Willis*, 888 N.E.2d at 182. This list of factors is not exclusive, and in some cases only certain factors may be relevant, but the factors must in all events be balanced against each other in determining whether a parent has used reasonable force in disciplining a child. *Id.*

Prior to the *Willis* case, in *Fettig* we reviewed a trial court's dismissal of an information for battery against a school teacher on similar grounds, concluding that "as long as the teacher acts within the limits of her 'jurisdiction and responsibility as a teacher,'" teachers are entitled to the same privileges to discipline a child as parents are. *Fettig*, 884 N.E.2d at 345 (quoting *Vanvactor v. State*, 113 Ind. 276, 15 N.E. 341, 342 (1888)). Moreover, teachers' actions in administering discipline are afforded "a presumption of having done their duty when punishing a student" above and beyond the "presumption of innocence shared by all criminal defendants." *Id.*

Thus, in *Fettig* we affirmed the trial court's dismissal of charges for battery against a teacher who slapped the face of a high school student who refused to participate in physical education activities because a friend was injured. We held that with "no weapons, no closed fist, no repeated blows, no verbal abuse, and the only alleged injury being a stinging sensation," the force used amounted to "physical punishment that [was] neither cruel and excessive" and the trial court was within its discretion to dismiss the battery charge against Fettig. *Id.* at 346. We rejected the State's argument in *Fettig* that "since the justification for teachers to corporally punish is limited by notions of reasonableness," whether Fettig's conduct was reasonable under the teacher's privilege to

discipline a student should have been presented to a jury. *Id.* at 345. We instead observed that "this is the very issue which our appellate courts have removed from the discretion of the jury." *Id.*

This court has applied *Willis* in evaluating the appeal of a school teacher convicted of battery who at trial had claimed her actions were privileged by the qualified immunity as provided in sections 20–33–8–8 and 20–33–8–9. *See Barocas v. State,* 949 N.E.2d 1256 (Ind.Ct.App.2011). In *Barocas,* we reversed a school teacher's battery conviction where the teacher flicked a student's tongue in order to prompt that student, who was diagnosed with Down syndrome, to pull her tongue back into her mouth, holding that the State did not disprove Barocas's defense. *Id.* at 1257–58.

Crucial to our analysis in the present case, in *Barocas* we distinguished between professional inappropriateness as opposed to the reasonableness of the force used and the belief in the necessity of its use. The trial court concluded that Barocas had flicked the child's tongue, and during the trial Barocas conceded that such a flick would be inappropriate, though she nevertheless maintained that she did not flick the child's tongue as described by witnesses and found by the trial court. The child in *Barocas* cried upon being disciplined, but we observed that there were "no Indiana decisions in which a parent or teacher's conviction of battery was upheld based on the use of force as minimal as that used by Barocas," and thus that the amount of force used was reasonable. *Id.* at 1260. We also concluded that it was

reasonable for Barocas "to believe that a physical prompt was necessary to control A.R.'s behavior of sticking out her tongue." *Id.* Distinguishing between the effect of a teacher's qualified immunity and professional conduct standards, we held that "the 'professional inappropriateness' *vel non* of an act" does not determine that a specific use of force was not reasonably necessary to control a child under a given set of circumstances. *Id.*

Here, Littleton was charged with Criminal Confinement, Neglect of a Dependent, and Battery for approving Stokes's request to confine C.J. to the Rifton chair, bind his hands, and tip him backward for several minutes. The evidence in the record before us reveals no dispute that C.J. was so bound. To the extent that the record does reveal disputed evidence concerning the extent to which Littleton approved of, was aware of, or participated in Stokes's actions in confining C.J., we afford the trial court's findings in this matter deference. Even so, we cannot conclude that the trial court was within its discretion to deny Littleton's motion to dismiss the charges and permit a jury to decide whether her acts were privileged.

At the *Garrity* hearing, Stokes, Albers, and Nancy Roll, a classroom aide in another teacher's room, each provided testimony about the events of February 18, 2010. Littleton did not testify, instead providing an affidavit with her account of events.[5] Stokes and Littleton both provided evidence that C.J. was actively harming himself. Stokes testified that he and Littleton followed an agreed-upon protocol of esca-

---

5. The State objected to the admission of the affidavit during the *Garrity* hearing because that hearing incorporated consideration of a motion to suppress evidence as well as a motion to dismiss. While the State acknowledges that a motion to dismiss may be supported by affidavits alone, it contends that consideration in the hearing of the motion to

suppress required that Littleton testify rather than be permitted to submit an affidavit without submitting to cross-examination. Because we do not reach the merits of the motion to suppress, we similarly do not address the State's argument as to the admissibility of the affidavit for purposes of reviewing the motion.

lating steps in an attempt to calm C.J. There is abundant evidence that neither he nor Littleton had any intent or expectation that C.J. would have been placed in any danger by being confined to the Rifton chair. Stokes indicated that C.J. was laughing as he confined the child, Littleton indicated that C.J. smiled at her when she approached him after Albers returned to the room, and Albers testified that C.J. was "perfectly content" after being released from the Rifton chair. Roll testified that, when she eventually approached Littleton about C.J.'s chair being tipped back, she told Roll that it occurred "so he would not tip himself over." (Tr. 119.)

There is conflicting evidence on the extent of Littleton's involvement with and knowledge of C.J.'s placement in the Rifton chair. Roll testified that on at least one visit to the classroom, she did not see Littleton in the classroom in a place where she would likely have seen C.J.'s position. Albers testified that Littleton could and did see C.J. in the chair. Stokes testified that Littleton was in and out of the room because of conferences, but that he would not have confined C.J. without Littleton's authorization. Littleton's affidavit indicates that she was not constantly present in the room because of conferences, and that she had instructed Stokes to take C.J. to gym or art class, rather than to confine him.

Taken together, the evidence favoring the trial court's denial of Littleton's motion to dismiss indicates that C.J. was engaged in self-harming behavior. An established protocol was used in an attempt to calm C.J. and thereby alleviate the behavior. This protocol, which used a series of escalating measures to attempt to bring C.J.'s conduct under control, was not effective. As a last resort, Littleton agreed to allow Stokes to place C.J. in the Rifton chair and then use a series of escalating measures to attempt to calm C.J., the last of which amounted to confinement and placing the back of the Rifton chair on the ground with C.J. seated in the chair. Stokes testified that the purpose of each of the measures was to calm C.J. and to prevent him from harming himself or others. C.J. did not calm down until after the chair had been tipped backward. By the time Albers released him from the chair, C.J. was smiling.

Whatever difficulty Albers may have had releasing C.J. from the chair, Littleton and Albers alike indicated that C.J. was unharmed and calm upon being released from the chair. There is no evidence that any medical assistance or intervention from a school superior was required. There is no evidence that C.J. was in any way harmed—temporarily or permanently—during this period, and the evidence indicates that Littleton and Stokes intended to prevent C.J. from harming himself or others. Littleton apparently relied upon her understanding that Stokes had obtained proper training in restraint through a prior employer, though this was ultimately not true. However unusual or surprising at first blush the path chosen may have been, Littleton's and Stokes's efforts to calm C.J. succeeded without imposing harm or apparently even risking harm.

Given Littleton's and Stokes's inability to control C.J.'s self-injurious behavior, their efforts to gradually try new measures to bring his conduct under control, and an apparent lack of training or established school rules for measures to control C.J.'s behavior, we cannot conclude that Littleton's condoning of C.J.'s confinement of a limited duration was either an unreasonable use of force or based upon an unreasonable belief that such action was necessary to protect C.J. and others in the classroom. Unlike *Willis*, C.J. bore no physical injuries. Unlike *Fettig*, no re-

sounding physical blow was struck. Unlike *Barocas,* C.J. displayed no distress at being placed into the Rifton chair and tipped backward, which in fact had an apparent calming effect while simultaneously avoiding injury and placing C.J. at *decreased* risk of harm.[6]

To the extent the trial court decided not to dismiss the charges because they extended beyond a charge of Battery to Neglect of a Dependent and Confinement, we observe that the Restatement test adopted in *Willis* expressly states that it applies both to the use of force and confinement. *Willis,* 888 N.E.2d at 182 (quoting Restatement (Second) of Torts, §§ 147(1), stating that "[a] parent is privileged to apply such reasonable force or to impose such *reasonable confinement*"). Thus, that the offenses charged included more than Battery did not preclude a decision to dismiss the charges.

In light of all this, it is apparent to us that Littleton's conduct comes within the scope of her statutory qualified immunity as a teacher managing a classroom, and the trial court abused its discretion in denying Littleton's motion to dismiss on those grounds. Here, as in *Barocas,* what is educationally appropriate and what is reasonable under the circumstances are not one and the same. *Cf. Barocas,* 949 N.E.2d at 1260 (distinguishing between professionally appropriate behavior and reasonable force in imposing control over a student). We therefore reverse the trial court's denial of Littleton's motion to dismiss in the *Garrity* order, and remand for entry of an order of dismissal of the State's charges in this matter.

Reversed and remanded.

MATHIAS, J., and CRONE, J., concur.

---

**6.** Albers testified that she thought she heard C.J. making coughing or choking sounds because his hands were placed over the opening to his G-tube. Yet Albers also testified that she had no training or experience with G-tubes. The trial court apparently did not find Albers's choking concerns to be significant, as evidenced by its omission of any mention of the G-tube in its findings and conclusions in both the *Garrity* and *Kastigar* orders. Indeed, the trial court's order adopts a narrative of Albers's return to the room that conforms to Littleton's affidavit and not Albers's testimony.