**THIRD DIVISION**
**BARNES, P. J.,**
**BOGGS and BRANCH, JJ.**

NOTICE: Motions for reconsideration must be *physically received* in our clerk's office within ten days of the date of decision to be deemed timely filed.
http://www.gaappeals.us/rules/

**March 3, 2015**

# In the Court of Appeals of Georgia

A14A1593. THE STATE v. PICKENS.

BARNES, Presiding Judge.

Melanie Pickens was a special education teacher who was indicted on six counts of cruelty to children and five counts of false imprisonment for actions involving five of her students. Pickens moved to dismiss the indictment based on her immunity as an educator under OCGA § 20-2-1001, and after a three-day hearing, the trial court granted her motion. The State appeals, arguing that the trial court erred because Pickens' actions did not constitute "discipline" and she did not act in good faith, both of which the statute requires for immunity from criminal prosecution. For the reasons that follow, we affirm.

OCGA § 20-2-1001 was enacted in 1997 as part of the "School Safety Act" and provides that:

(a) As used in this Code section, the term "educator" means any principal, school administrator, teacher, school counselor,

paraprofessional, school bus driver, volunteer assisting teachers in the classroom, tribunal members, or certificated professional personnel.

(b) An educator shall be immune from criminal liability for any act or omission concerning, relating to, or resulting from the discipline of any student or the reporting of any student for misconduct, provided that the educator acted in good faith.

Thus, to be entitled to immunity from prosecution under OCGA § 20-2-1001, a defendant must establish three things: (1) she is an educator; (2) the acts or omissions in questions were related to or resulting from disciplining a student or reporting a student for misconduct; and (3) the educator acted in good faith.[1]

"As a potential bar to criminal proceedings which must be determined prior to a trial, immunity represents a far greater right than any encompassed by an affirmative defense, which may be asserted during trial but cannot stop a trial altogether." *Bunn v. State*, 284 Ga. 410, 412-413 (3) (667 SE2d 605) (2008) (interpreting OCGA § 16-3-24.2, which provides immunity from prosecution for using threats or force under certain condition, including self-defense or defense of others). See also OCGA §

---

[1]Educators are also immune from civil liability under certain circumstances. OCGA § 20-2-1000; *Gamble v. Ware County Bd. of Ed.*, 253 Ga. App. 819, 824 (2) (b) (561 SE2d 837) (2002).

16-3-22, which grants immunity from criminal liability to any person "who renders assistance reasonably and in good faith to any law enforcement officer" under certain circumstances.[2] "[A] trial court must rule on a motion for immunity prior to trial." Id. at 412 (3).

The burden of proving entitlement to immunity by a preponderance of the evidence falls on the defendant. *Bunn*, 284 Ga. at 413 (3); *State v. Cohen*, 309 Ga. App. 868, 868-869 (711 SE2d 418) (2011). The old evidence code defined "preponderance of evidence" as "that superior weight of evidence upon the issues involved, which, while not enough to free the mind wholly from a reasonable doubt, is yet sufficient to incline a reasonable and impartial mind to one side of the issue rather than to the other." Former OCGA § 24-1-1 (5). The current evidence code, which is applicable to this case, does not define the meaning of "preponderance of evidence," but lists the kinds of evidence a factfinder may consider to determine "where the preponderance of evidence lies." OCGA § 24-14-4 (2014). That evidence includes

---

[2]Only one case has cited this statute, and then only in passing. *Carter v. State*, 129 Ga. App. 536, 538 (199 SE2d 925) (1973).

the facts and circumstances of the case, the witnesses' manner of testifying, their intelligence, their means and opportunity for knowing the facts to which they testified, the nature of the facts to which they testified, the probability or improbability of their testimony, their interest or want of interest, and their personal credibility so far as the same may legitimately appear from the [hearing]. The [factfinder] may also consider the number of the witnesses, though the preponderance is not necessarily with the greater number.

Id.

"On appeal of an order [granting or] denying a motion for immunity from prosecution, we review the evidence in the light most favorable to the trial court's ruling, and we accept the trial court's findings with regard to questions of fact and credibility if there is any evidence to support them." (Citation and punctuation omitted.) *State v. Bunn*, 288 Ga. 20, 23 (701 SE2d 138) (2010); see also *Hipp v. State*, 293 Ga. 415, 418 (746 SE2d 95) (2013); *Cohen*, 309 Ga. App. at 869 (applying "any evidence" standard to trial court's findings of fact following pretrial evidentiary hearing addressing immunity under OCGA § 20-2-1001). "The trial court's application of the law is subject to de novo appellate review." *State v. Green*, 288 Ga. 1, 2 (2) (701 SE2d 151) (2010).

While numerous cases have analyzed immunity under OCGA § 16-3-24.2, *Cohen* is the only appellate case analyzing the application of OCGA § 20-2-1001 to bar a criminal prosecution of an educator. In *Cohen*, a teacher was charged with simple battery for grabbing or pushing three students. 309 Ga. App. at 868-869. The parties agreed that the defendant was an educator whose actions were undertaken for disciplinary reasons, but disagreed on whether he acted in good faith, with the State arguing that Cohen's actions contravened the school's no-touch policy and were therefore in bad faith. Id. at 868-869. The trial court granted Cohen's motion for immunity, and this court affirmed, observing that "the exact nature of the school policy at issue is not clear from the record" and noting specifically the school principal's contradictory testimony about whether a student could ever be touched. Id. at 869. We held that the evidence authorized the trial court to conclude that Cohen was acting in good faith and was thus entitled to immunity from prosecution. Id. at 870.

Pickens' indicted charges involved five different special education students and were based on three types of conduct: confining students in a restrictive chair in the classroom or confining them and leaving them alone (six counts), recording a child's screams and playing them back to the child or imitating a child's screams or cries to

the child (three counts), and "slamming" a child against school walls and lockers (two counts). She filed a motion to dismiss the indictment for immunity from prosecution under OCGA § 20-2-1001, contending that she acted to maintain discipline and order and that she acted in good faith.

The trial court held a three-day evidentiary hearing during which Pickens called five witnesses and the State called six.[3] One of the State's witnesses was qualified as an expert in behavior management strategies for students with moderate and severe developmental disabilities, and one witness investigated the claims against Pickens for the Georgia Professional Standards Commission (GPSC). The other eight witnesses had worked with or alongside Pickens in the special education hall of the middle school in question during the 2006-2007 school year, which is the underlying actions allegedly occurred.

At the end of the hearing, the trial court orally granted Pickens' motion for immunity from criminal prosecution under OCGA § 20-2-1001, and subsequently issued a lengthy written order summarizing the testimony and concluding that Pickens

[3]A total of ten witnesses testified, because both sides called the same witness, a paraprofessional who had been assigned to Pickens' classroom during the time period in question. The paraprofessional asserted her Fifth Amendment right not to testify when Pickens called her, but was then granted immunity and the State called her to testify during its presentation of evidence.

met her "burden of showing by a preponderance of the evidence that all actions were done to maintain discipline and order and the actions were done in good faith." The court thus dismissed the indictment.

On appeal, the State does not dispute that Pickens was an "educator" under the statute, but argues that the record does not support the trial court's conclusions that Pickens' actions were "used to discipline the misbehaving student and maintain order and safety in the classroom," or that Pickens acted in good faith.

1. The State argues first that the record does not support the trial court's conclusion that Pickens' actions were "used to discipline the misbehaving student and maintain order and safety in the classroom," but instead showed that Pickens acted "from an inability to control her anger and frustration with the job."

As the State points out, our Supreme Court has defined "discipline" as "control obtained by enforcing compliance or order." *Randolph v. State*, 269 Ga. 147, 150 (2) (496 SE2d 258) (1998) (rejecting void for vagueness claim against statute criminalizing sexual contact with a student by a person with "disciplinary authority," including teachers, principals, and assistant principals). While the State submitted evidence in this case that Pickens acted in frustration at times, other evidence revealed that in a classroom like Pickens', with five to seven developmentally

7

disabled children, a single child's actions could disrupt the entire classroom. Thus, actions taken to address the source of the disruption could constitute disciplinary actions, whether or not a teacher was frustrated when she took them.

For example, while the State argues that "crying was not a basis for disciplining a child," evidence presented at the hearing showed that a child's loud, continuous screams and cries prevented the other children from attending to their own work. A child who grabbed at other students, pushed their work onto the floor, turned over his desk, and performed other disruptive actions became the focus of the class and prevented the other children from learning. A child who "plopped" onto the floor and refused to get up blocked the path of other students and had to be attended while the other children were deprived of the attendee's time.

The five false imprisonment counts and one of the cruelty to children counts against Pickens were based on allegations that at some point during the 2006-2007 school year, she confined and isolated without supervision three different students, either across the hall from her classroom or in the bathroom, and also confined one of those students within her class. When the children were placed across the hall, they were secured in physically supportive seating designed for special needs students, and

8

the child who was placed in the bathroom was secured in a version of the chair that could be rolled over a toilet.

One child was placed alone across the hall to quell his loud disruptive crying. Either Pickens or her paraprofessional would check on him, and when he stopped crying she would bring him back into the classroom. The longest he remained across the hall was 15 minutes, and she placed him there so he could become quiet again, not to be malicious or hurt him.

Another child was placed across the hall when he became aggressive toward other students, tripping, pushing, and hitting them, pulling their hair, throwing their work on the floor, knocking things over, and screaming. He seemed calmer in the chair sometimes, but at other times he would just moved the chair around the room even when secured within it. When other methods failed, Pickens or her paraprofessional would move him across the hall by himself for some period of time. There was no evidence about the length of time the student remained across the hall, other than that the testimony of Pickens' paraprofessional that he was only once left there "for a good while," on the day that precipitated the investigation and charges against Pickens. That day the student was placed across the hall both before and after lunch because he would not stop hitting and pulling at the other students. He was

9

calmer when seated in the supportive chair and when placed alone because he got no attention from other students.

Other educators knew that Pickens was placing disruptive children across the hall and understood that its purpose was to maintain discipline and order in the classroom. If a child behaved, he stayed in the classroom with the other students.

Pickens was charged with false imprisonment for leaving the third student confined alone in a handicapped bathroom. This student had "bathrooming" issues, and sometimes would remain unattended in the supportive chair in a private toilet space for "a little while" when he was trying to have a bowel movement. While Pickens was also charged with false imprisonment for confining the child within the classroom, the only testimony regarding that count was from a teacher who once saw him in class reclining in the supportive chair at an angle from which it would have been difficult for him to get out.

Pickens was also charged with three counts of cruelty to three different children for recording them while they were screaming and playing it back to them or for imitating their screams or cries. One of the children would scream at a very high pitch when asked to do something he did not want to do. As noted earlier, these episodes of screaming and crying disrupted the class, and Pickens tried playing back or

imitating their screams in an effort to make them stop by showing them that the noise they were making was disruptive and upsetting to the other students. When the children heard themselves, sometimes they stopped screaming and crying and sometimes they did not.

Finally, Pickens was charged with two counts of cruelty to children for "slamming" them "face-first into lockers and walls." Evidence was adduced at the hearing that Pickens developed a technique to prop one of the students up against the wall with her body to prevent him from "plopping" onto the floor or to get him up after he did so.

The trial court concluded that this evidence was sufficient to show by a preponderance of the evidence that Pickens' actions were undertaken to maintain discipline and restore order in her classroom. Based on our review of the evidence presented, we cannot conclude that the trial court erred in its findings of fact that Pickens acted to maintain discipline and order in her classroom.

2. The State also contends that the record does not support the trial court's conclusion that Pickens acted in good faith. " 'Good faith' is a subjective standard: a state of mind indicating honesty and lawfulness of purpose; belief that one's conduct is not unconscionable or that known circumstances do not require further

11

investigation." (Punctuation and footnote omitted.) *Owen v. Watts*, 307 Ga. App. 493, 496 (1) (705 SE2d 852) (2010) (trial court was authorized to find by preponderance of evidence that person's conduct was not undertaken in good faith and therefore person was not immune to protective order). Generally, "[t]he existence of good faith is a question for the trier of fact, and a trial court's finding on the issue of good faith will be upheld if there is any evidence to support it." (Citations omitted.) *Gay v. Strain*, 261 Ga. App. 708, 712 (3) (583 SE2d 529) (2003) (defendant in bona fide possession of disputed land entitled to set-off of value of permanent improvements "placed on the land in good faith").

The State notes that this Court in *Cohen* clarified that the determination of good faith under OCGA § 20-2-1001 does not rest solely upon whether the educator was complying with school policy. 309 Ga. App. at 860-870. We agree with the State, however, that violations of school policy are relevant to whether an educator acted in good faith, if not determinative. But here, although the State elicited testimony that there were no county policies *permitting* the use of restraint and isolation of developmentally disabled students during this time period, the evidence also established that there were also no county- or state-wide policies *prohibiting* the practice then, as there are now. The county offered little training in methods of

12

handling children with more difficult behavior problems, and only later made available training in the prevention and management of aggressive behavior in developmentally disabled students. As Pickens observes, the school's policy about touching and discipline in *Cohen*, 309 Ga. App. at 869, was unclear, while in this case the county had no policy at all. Pickens was therefore left to develop her own coping strategies to manage "a rough group of kids," including one 13-year-old who was larger than she and who grew progressively more aggressive as the year passed.

Pickens gathered data documenting this child's aggression and attempted unsuccessfully to have him moved to a different program that dealt with more aggressive developmentally disabled children. In fact, two months after entering high school the following year, the student was placed into the other program. The investigator for the Georgia Professional Standards Commission testified that Pickens thought it was necessary for her to physically restrain or remove this student because his behavior could endanger the other children in her care, and she believed that it was okay for her to place disruptive children across the hall. She did so either to have them calm down or to remove the source of the disruption for the benefit of the other students.

The county behavioral therapist testified that "time-out" is an effective intervention for children seeking attention inappropriately, and the facility for more aggressive students had a "time-out" room where out-of-control students were placed by themselves, although they were observed. The State's expert psychologist testified that restraint was appropriate to avoid allowing a student to injure himself or to protect other children, although he also thought children who were restrained should be supervised. Further, he testified that putting a child into "time-out" was an appropriate response to certain behaviors, such as aggression. The county had no specific rules regarding "time-outs" until after a civil lawsuit related to these acts was filed.

Other educators were aware that Pickens placed students across the hall from her main classroom, and while some of them testified that they would never have left any student alone at any time, none of them made any attempts to stop it. Pickens' paraprofessional also placed the children across the hall when directed to do so. The only teacher who reported Pickens to her superiors did so only after one of the children smeared feces all over himself and his surroundings in the short time between when Pickens' paraprofessional checked on him before attending the other teacher's classroom and a few minutes later when the educator was returning to her

14

class. That teacher also admitted there were times when she had no choice but to leave a child unattended in the bathroom when she went to retrieve her paraprofessional to change places with her.

As to Pickens' attempts to come up with methods to stop her students from screaming, shouting, or crying so loudly that classroom activities were effectively halted, she admitted that she came up with what she called "scream therapy" on her own, to mirror the screaming child's actions and help him or her see how the loud noise disrupted class and upset the others. Although the method was effective sometimes, she stopped using it when another educator told her to stop and she realized its use was inappropriate.

Further, the evidence showed that Pickens developed the technique of propping students against the wall to keep them from plopping onto the floor or to get them up after they did so. In fact, when one of her students plopped on the floor in gym class, Pickens was summoned to get him back on his feet. While the behavioral psychologist testified that when a student plopped on the floor and refused to get up, the best course was to leave him there, or at least obtain assistance in moving him, at times Pickens was unable to "get people from the front to help" deal with a

recalcitrant student. If a student plopped down and no one was around to help, Pickens was on her own.

Pickens told the investigator that her actions were never malicious, that she never tried to hurt any of her students, and that whatever she did with her students was aimed at helping them. One of the paraprofessionals testified that the more aggressive child loved Pickens, and another educator testified that Pickens seemed fond of the child, who remained in Pickens' classroom for three years.

Considering the evidence presented at the hearing, we conclude that the trial court was authorized to find that a preponderance of evidence showed that Pickens acted in good faith and was entitled to the benefits of the immunity statute.

*Judgment affirmed. Boggs and Branch, JJ., concur*.