**FIRST DIVISION**
**BARNES, P. J.,**
**GOBEIL and PIPKIN, JJ.**

NOTICE: Motions for reconsideration must be *physically received* in our clerk's office within ten days of the date of decision to be deemed timely filed.
https://www.gaappeals.us/rules

October 25, 2024

# In the Court of Appeals of Georgia

A24A0773. ASEKERE v. THE STATE.

GOBEIL, Judge.

After a high school basketball player died during practice, the team's coach, Larosa Asekere, was charged with numerous offenses, including second-degree murder. Asekere moved for immunity from prosecution under OCGA § 20-2-1001, and the trial court denied her motion. We granted Asekere's application for interlocutory review, and on appeal, she argues that the trial court erred by finding that her actions did not amount to "discipline" as set forth in OCGA § 20-2-1001. For the reasons that follow, we now affirm.

"On appeal of an order granting or denying a motion for immunity from prosecution, we review the evidence in the light most favorable to the trial court's

ruling, and we accept the trial court's findings with regard to questions of fact and credibility if there is any evidence to support them." *State v. Pickens*, 330 Ga. App. 862, 864 (769 SE2d 594) (2015) (citation and punctuation omitted); see also *State v. Cohen*, 309 Ga. App. 868, 869 (711 SE2d 418) (2011) (applying "any evidence" standard to trial court's findings of fact following pretrial evidentiary hearing addressing immunity under OCGA § 20-2-1001). "The trial court's application of the law is subject to de novo appellate review." *Pickens*, 330 Ga. App. at 864 (citation and punctuation omitted).

On August 13, 2019, student I. B., attended conditioning practice after school for the girls' basketball team at the Elite Scholars Academy in Clayton County. Asekere was a teacher at Rex Mill Middle School and also was employed as the head coach of the varsity girls' basketball team at Elite Scholars Academy. The practice, which was led by Asekere and assistant coach, Dwight Palmer, lasted a few hours and required the students to complete a number of drills, including stretching, running a mile, planks, and running up and down the bleacher stairs. Due to the extreme heat, the athletic coordinator for Clayton County Public Schools had issued a heat advisory warning for that week to the athletic directors and principals in the district, but it is

unclear whether notice of the heat advisory was forwarded to Asekere.[1] Witnesses reported that I. B. was struggling while participating in the conditioning activities. During the last exercise, which involved running up and down the bleacher steps, I. B. collapsed and ultimately died.

Asekere and Palmer were indicted for second-degree murder, cruelty to children in the second degree, involuntary manslaughter, and reckless conduct. Asekere filed a motion seeking immunity from prosecution under OCGA § 20-2-1001,[2] which provides in relevant part: "An educator shall be immune from criminal liability for any act or omission concerning, relating to, or resulting from the discipline of any student or the reporting of any student for misconduct, provided that the educator acted in good faith." OCGA § 20-2-1001 (b).

Following a hearing, the trial court denied Asekere's motion for immunity under OCGA § 20-2-1001. The court found that Asekere established the first and third elements (acted as an educator and in good faith), but Asekere was unable to prove the second element, discipline. According to the court, the physical

[1] The school principal stated that she was unaware that any outdoor athletic activities had been scheduled for August 13, 2019.

[2] Palmer later joined Asekere's motion.

3

conditioning in which I. B. was participating did not constitute "discipline" as contemplated by OCGA § 20-2-1001. The court noted that Asekere

> never had to argue with or yell at the victim . . . or institute additional activities such as, for example, have the victim run a lap around the track or do extra pushups or sit-ups, because of any disruptive behavior being exhibited on the part of the victim or the other girls. Here, the victim . . . was fully compliant and not disruptive in any way.

The trial court issued a certificate of immediate review. We subsequently granted Asekere's application for interlocutory review in Case No. A23I0178.[3] This appeal followed.

The grant of immunity is a threshold issue, which would be irretrievably lost if the case proceeded to trial. See *Bunn v. State*, 284 Ga. 410, 413 (3) (667 SE2d 605) (2008) ("As a potential bar to criminal proceedings which must be determined prior to a trial, immunity represents a far greater right than any encompassed by an affirmative defense, which may be asserted during trial but cannot stop a trial

---

[3] Palmer also filed an application for interlocutory review from the trial court's order denying the immunity motion, but we dismissed the application as untimely. See Case No. A23I0182 (dismissed April 26, 2023). Palmer is not part of the instant appeal.

altogether."). The burden of proving entitlement to immunity by a preponderance of the evidence falls on the defendant. Id.

OCGA § 20–2–1001 was enacted in 1997 as part of the "School Safety Act" and provides that:

> (a) As used in this Code section, the term "educator" means any principal, school administrator, teacher, school counselor, paraprofessional, school bus driver, volunteer assisting teachers in the classroom, tribunal members, or certificated professional personnel.
>
> (b) An educator shall be immune from criminal liability for any act or omission concerning, relating to, or resulting from the discipline of any student or the reporting of any student for misconduct, provided that the educator acted in good faith.[4]

Thus, to establish immunity for criminal prosecution under this statute, Asekere must prove by a preponderance of the evidence that: "(1) she is an educator; (2) the acts or omissions in question were related to or resulting from disciplining a student or reporting a student for misconduct; and (3) [she] acted in good faith." *Pickens*, 330 Ga.

---

[4] With respect to *civil* liability, OCGA § 20-2-1000 (b) provides: " No educator shall be liable for any civil damages for, or arising out of, any act or omission concerning, relating to, or resulting from the discipline of any student or the reporting of any student for misconduct, except for acts or omissions of willful or wanton misconduct."

App. at 863 (footnote omitted). As noted by the trial court, there is no dispute that Asekere met the first and third elements of the statute, in that she is an educator and her actions on the date in incident were taken in good faith as she engaged the team in physical conditioning to prepare the team for the upcoming basketball season. As a result, the only prong at issue in the instant appeal is whether Asekere's actions were related to or resulted from disciplining the students on the team, including I. B.

As Asekere points out, the trial court's determination of whether Asekere was entitled to immunity under OCGA § 20-2-1001 turns on its interpretation of the word "discipline." The trial court relied on the Supreme Court's opinion in *Randolph v. State*, which defined "discipline" (in the context of a different statute) as "control obtained by enforcing compliance or order[.]" 269 Ga. 147, 150 (2) (496 SE2d 258) (1998).

> Tasked with interpreting statutory language, we necessarily begin our analysis with familiar and binding canons of construction. Indeed, in considering the meaning of a statute, our charge as an appellate court is to presume that the General Assembly meant what it said and said what it meant. And toward that end, we must afford the statutory text its plain and ordinary meaning, consider the text contextually, read the text in its most natural and reasonable way, as an ordinary speaker of the English language would, and seek to avoid a construction that makes some

6

language mere surplusage. In summary, when the language of a statute is plain and susceptible of only one natural and reasonable construction, courts must construe the statute accordingly.

*Monumedia II, LLC v. Dept. of Transp.*, 343 Ga. App. 49, 51-52 (1) (806 SE2d 215) (2017) (citations, punctuation and footnotes omitted).

In *Randolph*, the Supreme Court of Georgia noted that the term "discipline" is not a term of art, and thus, the Court turned to the dictionary to determine the meaning of the word.[5] 269 Ga. at 150 (2). The primary definition of "discipline" is "[c]ontrol obtained by enforcing obedience or order."[6] The secondary definition is "[p]unishment intended to correct or train."[7] In other words, the meaning of discipline is broader than simply punishment. According to Asekere, if the broader definition of discipline is applied, a reasonable argument can be made that Asekere's

---

[5] The Supreme Court in *Randolph* relied on The American Heritage Dictionary of the English Language, Third Edition, copyright 1992, which was in existence when OCGA § 20-2-1001 was enacted in 1997. 269 Ga. at 150 (2).

[6] The American Heritage Dictionary of the English Language, Third Edition, copyright 1992.

[7] Id.

conduct constituted discipline because she was giving "directions" to the students who in turn "complied" with those directions.

We have had limited occasion to analyze the application of OCGA § 20-2-1001. In *Cohen*, a teacher was charged with simple battery for grabbing or pushing three students. 309 Ga. App. at 868-869. There was no dispute that the defendant was an educator whose actions were undertaken for disciplinary reasons. Id. The parties, however, disagreed on whether the defendant acted in good faith, with the State arguing that the defendant's actions contravened the school's no-touch policy and were therefore taken in bad faith. Id. at 869. The trial court granted the defendant's motion for immunity, and this Court affirmed, holding that because "the exact nature of the school policy at issue is not clear from the record," including the school principal's contradictory testimony about whether a student could ever be touched, the evidence authorized the trial court to conclude that the defendant was acting in good faith and thus entitled to immunity from prosecution. Id. at 869-870.

Next, in *Pickens*, we addressed whether an educator-defendant's actions were used to discipline a misbehaving student and taken in good faith. 330 Ga. App. at 865. Citing to the definition of discipline from *Randolph* referenced above, we explained

8

that the defendant's actions in response to managing a classroom with five to seven developmentally disabled children — including confining a student to chair, recording a child's screams and playing that back to the child, and slamming a child against school walls and lockers — were undertaken in response to disruptive behavior or the potential for disruption in the classroom. Id. at 866-867 (1). We also found that the defendant acted in good faith in her attempts to discipline the children; no school policy specifically prohibited the methods she employed in the classroom, a county behavioral therapist largely approved of the methods, and the defendant told an investigator that her actions were intended to help the students, rather than taken with malice. Id. at 868-870 (2).

There is no dispute that in conducting the basketball session, Coach Asekere was discharging her duties in educating[8] students and retained broad judgment in planning the safe conduct of the session and in deciding whether any safety hazards existed. See *Santa Fe Independent School Dist. v. Doe*, 530 U. S. 290, 311 (III) (120 SCt 2266, 147 LE2d 295) (2000) (noting that extracurricular activities are important to

---

[8] As applicable here, to "educate" means "[t]o provide with knowledge or training in a particular area or for a particular purpose[.]" The American Heritage Dictionary of the English Language, Third Edition, copyright 1992.

many students as part of a complete educational experience). Asekere asserts that she was controlling the conduct of the student athletes during a scheduled practice. She required that they run and climb stairs and do other exercises in the heat, and the girls complied with Asekere's orders. Presumably they did so in order to become and remain members of the basketball team. In support, Asekere highlights that at the hearing on the immunity motion, the school's athletic director testified that as head coach, Asekere was in control of practices and if she asked student athletes to complete drills or exercises, the expectation was that the students would comply. Two students, who helped to manage the girls' basketball team at the time of the incident, testified that during the conditioning drills on August 13, 2019, Asekere "was just instructing the girls to do the exercises that she thought were good to do that day," and the team followed her directions. Another member of the basketball team who participated in the conditioning drills on August 13, 2019, described that Asekere instructed the team to do exercises and the team followed the coach's directives. A parent who observed part of the practice, testified that the practice had an order imposed by the coaches and the students complied with the coaches' directions.

In denying Asekere's motion seeking immunity, the trial court explained:

10

Here, the victim, as well as all the other girls, was fully compliant and not disruptive in any way. Thus, [Asekere] did not have to take any actions at all to gain control over the victim nor had to do anything to obtain control to enforce compliance or order by the victim or any of the other girls; that is, no discipline, as that term is defined in *Randolph* [ ] was deployed by [Asekere] with regard to the victim in this case.

Asekere argues that the trial court's ruling is unduly restrictive and limits the exercise of discipline to instances involving punishment such as actions taken to address "misconduct, non-compliance, or disruption." Asekere counters that her actions amount to discipline because she imposed control and order over the practice through her instructions during the drills and the students' compliance. Asekere maintains that the trial court's reasoning is "circular" because "it seems to state that control was not being imposed because control was already imposed, and the students were already complying." She cautions that if a teacher has to "argue" or "yell" to enforce discipline, this will "yield unintended consequences by immunizing the loud, firebrand coach and leaving the calm, controlled coach without any protection."

Contrary to Asekere's assertion, the trial court did not solely focus on whether Asekere's actions amounted to punishment. Rather, the court highlighted that Asekere did not take affirmative steps to enforce control or direct the behavior of the

11

students during the training session, aside from her general instructions to conduct the drills. For example, there is nothing to suggest that I. B. or any other student failed to comply with Asekere's instructions during the drills or was disrupting practice in any way.[9] By comparison, in *Pickens*, we explained that the teacher's actions "could constitute disciplinary actions, whether or not a teacher was frustrated when she took them," because the teacher's actions were taken to address the disruptive actions of the students and "to maintain discipline and restore order in her classroom." 330 Ga. App. at 867 (1).

Importantly, as relevant here, OCGA § 20-2-1001 (b) pertains to "any act or omission concerning, relating to, or resulting from the discipline of any student or the reporting of any student for misconduct[.]" The General Assembly's word usage in

---

[9] During the hearing, a student who helped manage the girls' basketball team testified that, at the start of the practice while the students were stretching, Asekere made the team run a mile and go up and down stairs after one of the students "talked back." The trial court does not mention this incident in its order, and it is unclear based on the record before us when this interaction occurred and who exactly was involved. In any event, the trial court heard the testimony at the hearing firsthand and could decide what weight, if any, to give this evidence. See *Tate v. State*, 264 Ga. 53, 56 (3) (440 SE2d 646) (1994) ("Credibility of witnesses and the weight to be given their testimony is a decision-making power that lies solely with the trier of fact. The trier of fact is not obligated to believe a witness even if the testimony is uncontradicted and may accept or reject any portion of the testimony.").

this code section suggests that it intended the word "discipline" to mean something different than (passively) maintaining "control" or "conduct." After all, we normally presume "that the legislature did not intend to enact meaningless language." *Pandora Franchising, LLC v. Kingdom Retail Group, LLLP*, 299 Ga. 723, 728 (1) (b) (791 SE2d 786) (2016) (citation and punctuation omitted).

Other sections of Title 20, Chapter 2, titled "Elementary and Secondary Education," of which OCGA § 20-2-1001 is part, provide further context for the meaning of the word "discipline." See, e.g., OCGA § 20-2-731 ("An area, county, or independent board of education may, upon the adoption of written policies, authorize any principal or teacher employed by the board to administer, in the exercise of his sound discretion, corporal punishment on any pupil or pupils placed under his supervision in order to maintain proper control and discipline."); OCGA § 20-2-738 (a) ("A teacher shall have the authority, consistent with local board policy, to manage his or her classroom, discipline students, and refer a student to the principal or the principal's designee to maintain discipline in the classroom."). In these code sections, the word discipline appears to mean something more than the general supervisory or management role of an educator while working and interacting with students.

Additionally, our case law interpreting civil immunity for teachers aligns with a narrower interpretation of "discipline" than urged by Asekere and involves an affirmative act or response (or inaction) by the educator to address a student's behavior or misconduct. In *Board of Trustees of Ga. Military College v. O'Donnell*, a student at Georgia Military College ("GMC") filed a civil suit against the institution for negligence seeking damages arising from injuries she sustained after performing a series of physical exercises as punishment for violation of the honor code. 352 Ga. App. 651, 651 (835 SE2d 688) (2019). GMC argued that OCGA § 20-2-1000 (b) provided a basis for its immunity in the civil suit. Id. at 658 (2). Although we did not explicitly reach the question of whether the educator's actions amounted to "discipline" as that word is used in OCGA § 20-2-1000,[10] we described the policy used by the GMC educator "to correct a student's behavior," which led to the plaintiff's injuries, as a valid "disciplinary policy." Id. at 657 (1) (b). And in *Gamble v. Ware County Bd. of Ed.*, 253 Ga. App. 819, 823-824 (2) (b) (561 SE2d 837) (2002),

---

[10] We clarified that because GMC is a state entity, the Georgia Tort Claims Act, OCGA § 50-21-20 et seq., provides "the exclusive remedy for any tort committed by a state officer or employee," and thus, OCGA § 20-2-1000 had no application to the case. *Board of Trustees of Ga. Military College*, 352 Ga. App. at 658 (2).

14

we described the decision to suspend a student after a report of sexual misconduct as discipline that would qualify under the civil immunity statute, OCGA § 21-2-1000 (b).

The General Assembly in Georgia could have opted to extend criminal immunity to educators in any setting involving their actions or conduct related to managing students, but it chose not to do so.[11] See *Morton v. Bell*, 264 Ga. 832, 833 (452 SE2d 103) (1995) ("[I]f some things (of many) are expressly mentioned [in a statute], the inference is stronger that those omitted are intended to be excluded than if none at all had been mentioned.") (citations and punctuation omitted). We agree with Asekere that "[c]ourts should examine the circumstances of each case and whether there was an attempt by a teacher to control and impose order through their directives." In this case, however, there is no indication that Asekere took any actions to impose order or control over the students; rather, Asekere was engaged in managing and supervising the students through her presence as a coach during a routine training session at the time of I. B.'s death. If we adopted the position advocated by Asekere, the immunity afforded under OCGA § 20-2-1001 would

---

[11] For instance, the General Assembly could have stated that educators are immune from criminal liability for any act or omission in carrying out their duties, provided that the educator acted in good faith.

essentially extend to any act of an educator in the course of performing his or her professional duties — an interpretation we find is broader than the language the General Assembly has adopted.[12]

---

[12] Although not binding authority, it is notable how other jurisdictions have addressed cases involving liability for educators in light of the limited Georgia case law in this area. For example, with respect to civil liability in Texas:

> A professional employee of a school district is not personally liable for *any act* that is incident to or within the scope of the duties of the employee's position of employment and that involves the exercise of judgment or discretion on the part of the employee, except in circumstances in which a professional employee uses excessive force in the discipline of students or negligence resulting in bodily injury to students.

Tex. Code § 22.0511 (a) (emphasis supplied). The Supreme Court of Texas has clarified that civil immunity under that state's law terminates in instances where a teacher acts negligently in disciplining students and as a result, causes bodily injury. *Barr v. Bernhard*, 562 SW2d 844, 849 (Tex. 1978). In *Fort Wayne Community Schools v. Haney*, 94 NE3d 325, 328-330 (I) (Ind. Ct. App. 2018), the Court of Appeals of Indiana reversed the partial denial of a teacher's and school district's motion for summary judgment in a suit alleging battery against a minor student on the ground that even though the teacher spanked the student in an attempt to redirect the student to her seat, the teacher's conduct in attempting to discipline the student was in good faith and reasonable and therefore protected under Ind. Code Ann. § 20-33-8-8 (b), the qualified immunity statute for educators. See also *Littleton v. State*, 954 NE2d 1070, 1079-1080 (Ind. Ct. App. 2011) (reversing the trial court's denial of teacher's motion to dismiss felony charges of criminal confinement, neglect of a dependent, and misdemeanor battery (stemming from restraining a student to chair "when no other

Based on the foregoing, we conclude that the trial court did not err in denying Asekere's motion seeking immunity from prosecution under OCGA § 20-2-1001, and we affirm the judgment.

> The doctrine of separation of powers is an immutable constitutional principle which must be strictly enforced. Under that doctrine, statutory construction belongs to the courts, legislation to the legislature. Our decision today gives appropriate deference to the legislative process and separation of powers.

*Cavalier Convenience, Inc. v. Sarvis*, 305 Ga. App. 141, 147 (699 SE2d 104) (2010) (citations and punctuation omitted). If the legislature intends for criminal immunity to apply to the facts of this case, it is for the General Assembly to specify the scope of the conduct covered accordingly.

> *Judgment affirmed. Barnes, P. J., and Pipkin, J., concur.*

---

calming measure proved effective") on the basis that the teacher's conduct fell "within the scope of her statutory qualified immunity as a teacher managing a classroom") (citation and punctuation omitted). Again, in all of the above examples, the educators engaged in affirmative steps to enforce control or order in an education setting in response to a student's behavior.